UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHERE FARRELL and          :    **CIVIL NO. 1:07-CV-2324**
KEITH RIVENS,              :
                          :    (Magistrate Judge Smyser)
          Plaintiffs       :
                          :
     v.                   :
                          :
ASHCOMBE DOVER HOMEOWNERS   :
ASSOCIATION,              :
                          :
          Defendant        :

## MEMORANDUM AND ORDER

Background.

The complaint in this case was filed on December 26, 2007.  The plaintiffs are Chere Farrell and Keith Rivens.  They are the owners and the residents of a townhouse property in the Ashcombe Dover Development, a residential community in Dover, York County, Pennsylvania.  The defendant is the Ashcombe Dover Homeowners Association.

The complaint alleges that the plaintiff Chere Farrell is an African American female and that the plaintiff Keith Rivens is an African American male.  The complaint alleges that the plaintiffs are "handicapped as defined by the Americans With Disabilities Act."  The complaint alleges that the plaintiffs

have been subjected to unlawful discrimination by the defendant on the basis of the plaintiffs' race and on the basis of the plaintiffs' disabilities.

The plaintiffs purchased a townhouse in 2003 in the Ashcombe Dover Development in Dover Borough, York County, Pennsylvania, in the Middle District of Pennsylvania. Certain homeowner practices, and certain homes and properties maintenance requirements and standards and limitations affecting home and property modifications, were governed under rules and regulations of the defendant Homeowners Association, the complaint relates.

The complaint avers that plaintiff Farrell has debilitating rheumatoid arthritis, respiratory illness and back problems and that her physical disability is visibly noticeable. It is avered that plaintiff Rivens has debilitating rheumatoritis and back problems. He walks with the assistance of a cane. He has a pronounced limp. Both plaintiffs have been determined by the Social Security Administration to be disabled and unable to perform substantial gainful activity. The complaint alleges that the "Defendants"[1] were aware of the plaintiffs' disabilities. The

---

1. There is one defendant; however, the complaint repeatedly refers to "Defendants".

complaint alleges that the plaintiffs have extreme difficulty getting around when there is snow or ice on the ground, and that the "Defendants claim to have a policy not to remove snow until it reaches an accumulation on the ground of three inches."  In the winter of 2005-2006, the plaintiffs requested in writing to the "Defendants" to increase the frequency of snow removal around the plaintiffs' residence.  The "Defendants" arbitrarily refused to accommodate the plaintiffs, it is alleged.  The complaint alleges that the "Defendants" denied a housing accommodation to the plaintiffs because of their disabilities.

The complaint alleges that each of the plaintiffs was subjected to racially abusive behavior from the plaintiffs' neighbors in the development.  The complaint alleges that upon the plaintiffs' purchase of a residence, a member of the Board of Directors "stated to another neighbor, '[t]here goes the neighborhood, [t]hat nigger don't work so he must be a drug dealer, [w]e don't want them here and will do whatever it takes to run them out of here, and we are going to do everything to make them miserable and make them leave.'"  The complaint alleges that "on the advice of Defendant, Defendant's attorney and the local police, Plaintiffs posted "No Trespassing" signs on their property", that the signs were posted to keep the defendant's

contractors from trespassing on the plaintiffs' property (because the contractor's employee had damaged the plaintiffs' property and had subjected them to racial slurs), and that the "Defendants" had, after the signs were posted, fined the plaintiffs for posting the "No Trespassing" signs.  The "Defendants" also threatened the plaintiffs with "fines for outdoor storage issues" but took no steps against white residents similarly situated "regarding their outdoor storage issues".  The "Defendants threatened Plaintiffs with fines for having a flower border, but did not require similarly situated white families to remove their flower borders."  It alleges that each plaintiff is disabled within the meaning of the Social Security Act, that the defendant was aware of the plaintiffs' disabilities and that the defendant refused a request of the plaintiffs to remove snow accumulations of less than three inches.  The complaint alleges that the refusal of the defendant to remove snow accumulations of less than three inches for the plaintiffs, who had requested an accommodation to their disabilities in the form of the institution of a practice of snow removal of accumulations of less than three inches, was a denial of an accommodation that was reasonably requested "because of [the plaintiffs'] disabilities."

Count I of the complaint is the plaintiffs' claim of unlawful discrimination under the American with Disabilities Act. The plaintiffs have withdrawn this claim. It will not be further addressed herein.

Count II of the complaint states a claim of unlawful racial discrimination under the Fair Housing Act. This count is based upon factual allegations that the plaintiffs posted "No Trespassing" signs on their property on the advice of the defendant, the defendant's attorney and the local police, for the purpose of keeping the defendant's contractors from trespassing on the plaintiffs' property after an employee of the contractor had damaged the plaintiffs' property and had used racial slurs. Then, the defendant had fined the plaintiffs for posting the "No Trespassing" signs. Other factual allegations supporting the racial discrimination claim are that the plaintiffs were treated differently from white residents by the defendant in threatening the plaintiffs with a  fine "for outside storage issues" and "for having a flower border."

Count III states a claim of retaliation against the plaintiffs by the defendant. The claim is, factually, that after the plaintiffs filed a Pennsylvania Human Relations Commission

formal complaint the defendant attempted to force the plaintiffs to pay unwarranted fines and costs and attempted to force the plaintiffs to sell their home.

A second Count III states a claim under Pennsylvania law for the intentional infliction of emotional distress.

Counts IV and V were dismissed by the Order of July 1, 2008.

There is a claim in the complaint for punitive damages.

The defendant filed a motion for summary judgment, after the completion of discovery, on January 23, 2009. (Doc. 56). A brief in support, supporting Rule 56 documentation and a LR 56.1 statement of the material facts that the moving party contends not to be in dispute for Rule 56 purposes were filed. The plaintiff filed a brief in opposition, a responsive LR 56.1 statement for the plaintiffs, and exhibits, on February 27, 2009. (Docs. 63, 64, 67).

Discussion.

Summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).   The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   The moving party may discharge that burden by "'showing'-- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.   Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must "set out specific facts showing a genuine issue for trial."   Fed.R.Civ.P. 56(e).

An issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d Cir. 1988)

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A material factual dispute is a dispute as to a factual issue that will affect the outcome of the trial under governing law. *Anderson*, *supra*, 477 U.S. at 248.  In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, supra*, 477 U.S. at 322.  "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002)(quoting *Celotex, supra*, 477 U.S. at 323).

The defendant's summary judgment motion argues that, with discovery completed, there is not a genuine factual dispute as to

8

a material factual issue and that the defendant is entitled to judgment upon the remaining claims as a matter of law.

The plaintiffs' brief in opposition to the defendant's motion for summary judgment argues that the plaintiffs have established a case of racial discrimination under the Fair Housing Act, that the plaintiffs have established a *prima facie* case for retaliation under the Fair Housing Act, and that the plaintiffs have established a case for intentional infliction of emotional distress.

The plaintiffs have withdrawn their claim (Count I) of discrimination based upon their disabilities.  (Doc. 63, page 7).

Count II.  Unlawful Racial Discrimination.

The plaintiffs' brief in opposition to the defendant's motion for summary judgment (Doc. 63) states that the plaintiffs' claim of racial discrimination under the Fair Housing Act is based upon discrimination by the defendant against the plaintiffs because of the plaintiffs' race in terms of conditions of sale or in the provision of services or facilities to the plaintiffs.

The complaint alleges:

27.  Plaintiffs' protected race is African American.

28.  On the advice of Defendant, Defendant's attorney and the local police, Plaintiffs posted "No Trespassing" signs on their property.

29.  The signs were posted to keep the Defendant's contractors from trespassing on Plaintiffs property.

30.  The signs were posted because one of the employees of the contractor damaged Plaintiffs' property and subjected them to racial slurs.

31.  After being advised by Defendants, Defendant's attorney, and the local police to post the signs, Plaintiff were fined by the Defendants for posting the "No Trespassing" signs.

32.  Defendants threatened Plaintiffs with fines for outdoor storage issues, but took no steps or actions against white residents similarly [sic] situated regarding their outdoor storage issues.

33.  Defendants threatened Plaintiffs with fines for having a flower border, but did not require similarly [sic] situated white families to remove their flower borders.

42 U.S.C. § 3604(a) provides, as concerns racial discrimination, that it is unlawful:

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, handicap, familial status, or national origin.

11

The defendant argues that it should be granted summary judgment as to the plaintiffs' racial discrimination claims.  It argues that it is not an employer of the plaintiffs so as to provide a basis for a cause of action under Title VII and that it is not a state actor so as to provide a basis for a cause of action under 42 U.S.C. § 1983.  The plaintiffs do not argue otherwise as to the Title VII claim or as to the 42 U.S.C. § 1983 claim and, finding no basis to consider those claims further, we will  go on to address the Fair Housing Act racial discrimination claim.

The defendant argues that, after discovery, there is not evidence that supports the allegations in paragraphs 32 and 33 of the complaint that white residents were treated differently than the plaintiffs as to outdoors storage issues or as to fines for having a flower border.  The plaintiffs' brief (Doc. 63) does not refer to any evidence that white residents were treated differently than the plaintiffs as to outdoor storage issues or as to fines for having a flower border.[2]

---

2.  The plaintiffs' brief, at page 10, contains the assertion "Per the Defendant Exhibits, non African Americans received only one of two notices of violation, while the Plaintiffs received numerous notices of alleged violations of the rules and regulations."  This form of reference to putative evidence does not satisfy Rule 56 of

The LR 56.1 Statement of the defendant states (paragraphs 20, 21 and 22) that the Association's Declaration, Bylaws and Regulations prohibit "no trespassing" signs, outdoor storage and property dividers, that Caucasians who reside in the Association are not permitted to have "no trespassing" signs, outdoor storage or property dividers, and that the plaintiffs were never instructed by the defendant Association that they were not permitted to maintain a flower border. The plaintiffs' LR 56.1 Statement refutes these assertions. The defendant's brief cites evidence supporting its assertions. (Doc. 57, page 18, Exhibit "S", page 109, line 21; Exhibit "T", page 83, line 23; Exhibit "K", page 20, lines 11-25; Exhibit "M", page 31, line 12; Exhibit "N"). Plaintiff Rivens stated in deposition that he is not sure whether violation notices were issued to Caucasians, and plaintiff Farrell stated in deposition that she had no information that other persons violating outdoor storage rules were not fined by the Association and no information of anyone having been fined for having a flower border.

---

the Federal Rules of Civil Procedure or LR 56.1.  The general reference to "the Defendant Exhibits" as the source of evidence to establish that "non African Americans received only one of two notices" is vague and is not a meaningful showing of the existence of evidence.

The plaintiffs' summary judgment documentation includes three letters to the plaintiffs from the defendant Association providing notices of asserted violations of Association regulations. (Doc. 67, Exhibit 4).   The plaintiffs' brief's characterization of these letters as harassing (Doc. 63, page 13) is incorrect.   The letters merely provide notice of violations, with appropriate descriptions and references to regulations. There is not evidence presented for purposes of this motion for summary judgment of differences in treatment by the defendant Association of the plaintiffs as homeowners as compared to Caucasian homeowners.

Count III - Retaliation.

Plaintiffs contend in their brief that the defendant's retaliation-under-the-Fair-Housing-Act claim is based upon the defendant's interference with the sale of the plaintiffs' home by "refusing to cooperate at closing and [refusing to] allow the sale to be completed unless the [plaintiffs] agreed to drop the PHRC complaint." (Doc. 63, p. 14).   They cite the deposition of Chere Farrell, pages 105 and 106.   Plaintiff Farrell stated:

> A.   There was – Mr. Stone wanted a deal to be
> made.  He wanted me to agree – sign a paper in
> which he wanted me to agree not to sue the

14

Homeowners Association. And he wanted an
agreement to pay a specific amount of reduced
assessment to allow the closing to go through.
And I refused to sign away my rights.

Q. Did--to your knowledge, at the time you were
attempting to sell your home, did you have
outstanding assessments owed to the
Association?

A. Yes, I did.

Q. Do you recall the amount that was owed to
the Association?

A. I believe the total amount was $9,000 plus,
which I agreed to pay, but they refused to
accept.

Q. Do you remember when you agreed to pay the
$9,000?

A. At the closing. But that was not the deal
that they wanted. That was not the deal Mr.
Stone wanted.

Q. Was this after you already had a district
justice judgment against you?

A. Yes.

Q. Do you remember the amount of the district
justice judgment?

A. As I stated, it was $9,000 plus.

Q. And it's your testimony today that you
agreed to pay this $9,000 at closing, but you
wouldn't sign any paperwork?

A. I--my--I agreed that I would pay the
assessment, but Mr. Stone did not want that. He
wanted $4,500 in assessment fees plus a
statement that I would not pursue any other
legal avenues of suing or what ever type of

15

remedies toward the Homeowners Association, and I would not agree with that. There was backdoor dealings for two weeks without my knowledge with--between my buyer and the buyer's attorney, and I only found out after the seller became skittish. And then I was pressured by the seller, who didn't want to purchase my home, to agree with Mr. Stone's stipulations. And when I would not agree with Mrs. [sic] Stone's stipulations, there was a pullout.

Q.   Do you remember who the buyer was of the home?

A.    I don't recall.   I don't have that information with me. I can't recall.

Q.  Do you know the race--the race of the person that was to buy your home?

A.  Caucasian.

Q.  If I'm understanding your testimony right, you owed approximately $9,000 to the Association based on this judgment and they offered to cut it in half to $4,500?

A.  Yes.

Q.  But they wanted you to sign some additional paperwork?

A.  They wanted me to sign away my rights.

(Doc. 67, Exhibit 1, pp. 105-107).


     This testimony does not support the assertion in the plaintiffs' brief that the defendant sought to have a pending PHRC complaint dismissed.  If that was what the defendant's

16

attorney sought to negotiate, it is not what plaintiff Farrell stated in her deposition. The testimony did not refer to pending litigation, but did rather refer to prospective possible litigation. The testimony is that the defendant's representative sought an agreement from the plaintiffs not to bring litigation in the future in exchange for a compromise of an amount owed by the plaintiffs to the defendant. The plaintiffs have not shown there to be a genuine dispute as to a material factual issue in the matter of their claim that they were subjected to retaliation in that the defendant interfered with the plaintiffs' effort to sell their home in retaliation for the plaintiffs' claims made to the PHRC.

The plaintiffs' complaint alleges that:

37. Plaintiffs asserted their rights as disabled African Americans by filing a formal complaint with the Pennsylvania Human Relations Commission.

38. After being placed on notice that Plaintiffs had asserted their rights under the Pennsylvania Human Relations Act, Defendants retaliated against Plaintiffs by attempting to force them to pay unwarranted fines and costs associated with their unlawful discriminatory actions against Plaintiffs.

17

> 39.    After being placed on notice
> that Plaintiffs had asserted their
> rights under the Pennsylvania Human
> Relations Act, Defendants attempted
> to and continue to attempt  to force
> Plaintiffs to sell their home.

(Doc. 1).

The retaliation theory stated in the plaintiffs' brief in opposition to the defendant's motion for summary judgment is not the theory that is stated in the complaint.  It is a materially different theory.  The defendant was not placed on notice that it is plaintiffs' retaliation theory that the defendant sought to block the plaintiffs' effort to sell their home by negotiating for a reduction of the amount owed to the defendant by the plaintiffs in exchange for the plaintiffs' dismissal of their pending PHRC action against the defendant Association.   The theory of retaliation stated in the complaint is that the defendant attempted to force the plaintiffs to sell, a theory at odds, with both the testimony of plaintiff Farrell and the plaintiffs' brief.

Summary judgment will be granted in favor of the defendant and against the plaintiffs as to Count III-Retaliation.

<u>Count III - Intentional Infliction of Emotional Distress</u>.


        The claim that the defendant Association intentionally inflicted severe emotional distress upon the plaintiffs is based upon statements and conduct attributed to residents of the neighborhood, some of whom were Association Board of Directors members.    The pendant state law claim of an intentional infliction of emotional distress is proven, under Pennsylvania law, by proof of these elements: conduct that is extreme and outrageous, the occurrence of emotional distress in the plaintiff(s) caused by the conduct, and distress that is severe. *Bruffett v. Warner Communications, Inc.,* 692 F.2d 910, 914 (3d Cir. 1982).  The defendant argues that the racially outrageous statements attributed to the plaintiffs' neighbors by the plaintiffs, even if it is assumed that they may be attributed to the defendant Association, do not under applicable precedents give rise to the Pennsylvania law cause of action for the intentional and negligent infliction of emotional distress. Highly provocative racial slurs and other discriminatory incidents do not amount to actionable outrageous conduct under the Pennsylvania cause of action.  *Coney v. Pepsi Cola Bottling Company,* 1997 U.S. Dist. LEXIS 7722, *4-5 (E.D.Pa. May 29, 1997); *Parker v. DPCE, Inc.,* 1992 U.S. Dist. LEXIS 16921, *41-42

(E.D.Pa. 1991);  *Aiken v. Bucks Ass'n for Retarded Citizens, Inc.,* 1991 WL 243537, at *7.

A review of cases involving claims under Pennsylvania law for the intentional infliction of emotional distress reveals uncertainty over the nature of the cause of action, the scope of its applicability and even over whether there is such a cause of action under Pennsylvania tort law.  The plaintiffs do not cite a case that is precedential for the finding of such a cause of action in the circumstances presented here; that is, liability on the part of a homeowners' association for extreme and outrageous racially malicious comments made by association members to African American homeowners.

The plaintiffs consider this case to be materially distinguishable from *Coney v. Pepsi,* because here the plaintiffs were threatened and intimidated and had to seek medical treatment.  The statements that the plaintiffs have stated that their neighbors made were reprehensible, but highly provocative racial slurs and other discriminatory incidents directed by a neighbor to a neighbor, although reprehensible, do not give rise to a legal cause of action for the infliction of emotional distress even where as here the plaintiffs claim emotional

20

distress resulting in medical treatment and hospitalization from hearing the racially provocative words.   This case is not materially distinguishable from the *Coney* case.

Summary judgment will be granted in favor of the defendant and against the plaintiffs as to Count III - Intentional Infliction of Emotional Distress.

For the foregoing reasons, summary judgment will be entered in favor of the defendant and against the plaintiffs as to Counts II, III and III.   Count I has been voluntarily dismissed by the plaintiffs.   Counts IV and V were previously dismissed.   The Clerk shall enter judgment for the defendant and close the file.

                                   */s/ J. Andrew Smyser*
                                   J. Andrew Smyser
                                   Magistrate Judge

Dated:  March 26, 2009.